IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| V.W., a minor, by her mother and legal guardian, MELISSA WYBROW,<br><br>        Plaintiff,<br><br><br><br><br>                vs.<br><br><br>DAVINCI ACADEMY OF SCIENCE AND THE ARTS, et al.,<br><br>        Defendants. | MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br><br><br><br><br>Case No. 1:09-CV-127 TS |

This matter is before the Court on a Motion for Summary Judgment filed by Defendants

the DaVinci Academy of Science and Arts, Kelly Freeze, and Brenda Raccuia.  In the Motion,

Defendants Freeze and Raccuia argue that they are entitled to qualified immunity in relation to

the strip search of V.W. because the search did not violate V.W.'s constitutional rights and, even

if it did, those rights were not clearly established at the time of the search.  Defendants also argue

that the detention of V.W. did not violate her constitutional rights.  Defendant DaVinci argues

that it cannot be held liable under *Monell v. New York City Department of Social Services*.[1]

Finally, Defendants seek summary judgment on Plaintiff's state law claims, arguing they are

barred by the Utah Governmental Immunity Act.[2]

 For the reasons discussed below, the Court finds that Defendants Kelly Freeze and

Brenda Raccuia are entitled to qualified immunity for their role in the strip search of V.W.  The

Court finds that summary judgment is not appropriate on Plaintiff's claims concerning her

seizure.  The Court further finds that Defendant DaVinci cannot be held liable for its role in the

search.  Finally, the Court finds that Plaintiff's state law claims are barred by the Utah

Governmental Immunity Act.

## I.  SUMMARY JUDGMENT STANDARD

 Summary judgment is proper if the moving party can demonstrate that there is no genuine

dispute as to any material fact and it is entitled to judgment as a matter of law.[3]  In considering

whether a genuine dispute of material fact exists, the Court determines whether a reasonable jury

could return a verdict for the nonmoving party in the face of all the evidence presented.[4]  The

---

[1]436 U.S. 658, 694 (1978).

[2]Defendants initially argued that DaVinci Academy was not a state actor subject to suit under 42 U.S.C. § 1983.  Defendants have since withdrawn this argument.

[3]FED. R. CIV. P. 56(a).

[4]*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).

Court is required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party.[5]

## II.  STATEMENT OF FACTS

In 2008, V.W. was a freshman at the DaVinci Academy.  There was a drug problem at the school, with V.W. estimating that as many as three-fourths of the students used drugs.  On occasion, drugs were brought to the school to be sold.  It was known to both students and school officials that female students would hide drugs in their bras.

On the morning of December 8, 2008, V.W. and other students received a text message indicating that a student had drugs to sell.  Later that day, the Vice Principal of the DaVinci Academy was approached by a teacher and a student.  The student indicated that he had seen a student, later identified as V.W., pull pills from her socks and pass them to another student and saw the other student pass something, possibly money, back to V.W.[6]  This information was then reported to Defendant Kelly Freeze, who was the Director of Student Services at the time.

After V.W. had been identified as being involved in the alleged transaction, Ms. Freeze and a teacher unlocked V.W.'s locker where they found a licorice-like candy, but no contraband.

---

[5] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Sw. Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991).

[6] At the time of the incident, the informing student was not initially able to identify V.W. by name, but later identified her after looking at photos of students.

3

The Vice Principal then went to retrieve V.W. from class.[7]  When removed from class, V.W. appeared disoriented and ill.  V.W. had stated that she was not feeling well.

At that point, Ms. Freeze asked V.W. to remove her shoes and socks.  V.W. was informed that Ms. Freeze had called V.W.'s mother to inform her of the incident and that V.W.'s mother had given permission to search V.W.'s shoes and socks.  V.W. was asked if she would take off her shoes and socks, and she agreed.  Nothing was found in her shoes and socks.

Ms. Freeze then accompanied V.W. to the bathroom.  Ms. Freeze asked another teacher, Brenda Raccuia to assist her.  Ms. Raccuia stood by the door to the restroom to ensure that no one entered.  Ms. Freeze took V.W. to a large handicap stall, where she asked V.W. to lift up her shirt.  V.W. either lifted up or removed her sweater.  V.W. was also asked to turn out the corners of her bra, which she did.  V.W. was not asked to remove her bra and did not expose all of her breasts.  V.W. was also asked to turn out her pants pockets.  Again, this search revealed no contraband.

There is a dispute as to whether V.W. used the restroom once the strip search was concluded.  Viewing the evidence in the light favorable to the non-moving party, as the Court must, the Court finds for the purpose of this Motion that V.W. did not use the restroom.

After the strip search, Ms. Freeze took V.W. to her locker where the locker and her backpack were searched.  Again, nothing was found.  V.W. was then taken to the school office

---

[7]V.W. was removed from class during her fourth period.  The evidence concerning the timing of these events is less than clear.  However, taking the facts in the light most favorable to Plaintiff, V.W. was removed from class at approximately 11:40 A.M. and was kept in the office until her mother arrived around 2:00 P.M.

where she was told to stay.  Ms. Freeze testified that it was her intent that V.W. stay in the office until V.W.'s mother came to get her.  Ms. Freeze explained the reason for keeping V.W. in the office was to prevent V.W. from going into the hallway to interact with the students.  Ms. Freeze did not want rumors to spread about what had happened and was concerned that such rumors would disrupt the rest of the day.  Ms. Freeze, however, was not concerned that V.W. would try to get rid of any drugs or other contraband, because she believed V.W. had already gotten rid of anything she had.

When V.W. was placed in the office, she was seated next to a garbage can.  Defendants contend that the garbage can was placed near V.W. because she was sick and was to be used if she needed to vomit.  This, however, is in dispute.  While in the office, V.W. asked an office secretary between three and four times whether she could use the restroom.  Defendants argue that they believed V.W. needed to use the restroom because she was ill, but this too is in dispute. The office secretary consulted with Ms. Freeze who stated "That's what the garbage can's for."[8] V.W. was told by the office secretary: "Well, if you have to go that bad, there's a garbage can right there."[9]  V.W. then urinated in the garbage can.  This occurred in front of office personnel and one male student.  V.W. remained in the office until her mother picked her up.

### III.  DISCUSSION

Plaintiff's Amended Complaint brings claims under 42 U.S.C. § 1983, as well as claims for negligence and intentional infliction of emotional distress.  Plaintiff also seeks punitive

---

[8]Docket No. 44, Ex. 6 at 39:24-25.

[9]Docket No. 44, Ex. 4 at 48:25-49:1.

damages.  Defendants DaVinci Academy, Freeze, and Raccuia now seek summary judgment on those claims.

A.     SECTION 1983 CLAIMS

Before considering the parties' arguments concerning Plaintiffs' § 1983 claims, the Court must first consider what claims are at issue.  In her Memorandum in Opposition to Defendants' Motion for Summary Judgment, Plaintiff complains of five searches: (1) Kelly Freeze's search of V.W.'s locker prior to pulling her out of class; (2) the search of V.W.'s shoes and socks; (3) the strip search and inspection of V.W.'s bra; (4) the second search of V.W.'s locker; and (5) the search of the backpack.[10]  Plaintiffs' Amended Complaint, however, only discusses the search of V.W.'s shoes and socks and the strip search.[11]  The search of V.W.'s locker and backpack are nowhere mentioned in the Amended Complaint, therefore the claims related to these searches have been waived and will not be discussed.[12]

In addition, for the first time at oral argument, Plaintiff argued that DaVinci should be held liable for not having a policy concerning seizures.  Again, this claim is not mentioned in the Amended Complaint and there are no facts to support it.  Therefore, the Court will not consider this claim.  With this in mind, the Court turns to the issues presented in Defendants' Motion.

-----

[10]Docket No. 50 at 26.

[11]Docket No. 14, ¶¶ 10-12.

[12]Even if the Court were to consider the search of V.W.'s locker and backpack, the Court would find them to be constitutional under the framework discussed below.

*1.      Searches*

    *a.      Search of V.W.'s Shoes and Socks*

The Court will first address the search of V.W.'s shoes and socks.  The Supreme Court first considered the issue of searches in the school setting in *New Jersey v. T.L.O.*[13]  In *T.L.O.*, the Court held that the Fourth Amendment applies to searches conducted by public school officials.[14] The Court noted, however, "that the school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject."[15]  Therefore, the Court held that "school officials need not obtain a warrant before searching a student who is under their authority."[16]  The Court further found that "[t]he school setting also requires some modification of the level of suspicion of illicit activity needed to justify a search."[17]  While ordinarily a search would require probable cause, the Court found that "a careful balancing of governmental and private interests suggest that the public interest is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause."[18]  The Court, therefore, applied a standard of reasonable suspicion to determine the legality of a school administrator's search of a student.[19]

---

[13]469 U.S. 325 (1985).

[14]*Id.* at 333.

[15]*Id.* at 340.

[16]*Id.*

[17]*Id.*

[18]*Id.* at 341.

[19]*Id.* at 342.

Under this standard, school officials must have a "moderate chance of finding evidence of wrongdoing."[20]

The Court in *T.L.O.* established a two-step inquiry to determine the reasonableness of any search.[21]  First, one must consider whether the action was justified at its inception.[22]  Second, one must determine whether the search conducted was reasonably related in scope to the circumstances which justified the interference in the first place.[23]  "Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction."[24]

Under this standard, the decision to search V.W.'s shoes and socks was reasonable under the circumstances.  As set forth above, DaVinci was a school with a drug problem.  On the morning of the incident, school officials had received information that V.W. was dealing drugs.  The report indicated that the drugs originated from V.W.'s socks.  Based on the information received, school officials had a moderate chance of finding evidence of wrongdoing in V.W.'s shoes and socks.  As the Supreme Court recently stated: "If a student is reasonably suspected of

---

[20]*Safford Unified Sch. Dist. #1 v. Redding*, 129 S.Ct. 2633, 2639 (2009).

[21]*T.L.O.*, 469 U.S. at 341.

[22]*Id*.

[23]*Id*.

[24]*Id*. at 342.

giving out contraband pills, she is reasonably suspected of carrying them on her person . . . ."[25] Further, the search of V.W.'s shoes and socks was not excessively intrusive in light of V.W.'s age and gender and the nature of the alleged infraction.  Therefore, the search of V.W.'s shoes and socks did not violate the Fourth Amendment.[26]

   *b.*  *Strip Search*

   The Supreme Court recently clarified the law as to when school officials may strip search a student.  In *Safford Unified School District #1 v. Redding*, the Court addressed "whether a 13-year-old student's Fourth Amendment right was violated when she was subjected to a search of her bra and underpants by school officials acting on reasonable suspicion that she had brought forbidden prescription and over-the-counter drugs to school."[27]  The Court concluded that "[b]ecause there were no reasons to suspect the drugs presented a danger or were concealed in her underwear" the search violated the Constitution.[28]

   In *Safford*, a school official asked 13-year-old Savana Redding to come to his office.  The official showed Redding a day planner, which contained a number of contraband items, including knives, lighters, a permanent marker, and a cigarette.  Redding admitted that the planner was hers, but denied ownership of any of the items in the planner.  The school official then showed Redding four white prescription-strength ibuprofen 400-mg pills, and one over-the-counter blue

---

[25]*Safford Unified Sch. Dist. #1*, 129 S.Ct. at 2641.

[26]The search of V.W.'s backpack and locker would be constitutional for the same reasons. However, Plaintiff waived these claims by not including them in her Amended Complaint.

[27]*Id.* at 2637.

[28]*Id.*

naproxen 200-mg pill, all of which are used for pain and inflamation, but banned under school

rules.  The school official informed Redding that he had received a report that Redding was

giving these pills to other students.  Redding denied the accusation, but agreed to let the school

official search her belongings.  A search of Redding's backpack revealed nothing.  At that point,

the school official instructed another official to take Redding to the school nurse to have her

clothes searched for pills.  Redding was first asked to remove her outer clothes, after which she

was asked to pull her bra out and to the side and shake it, and to pull out the elastic on her

underpants, thus exposing her breasts and pelvic area to some degree.  No pills were found.

> The Court began its discussion by reviewing its previous decision in *T.L.O.*

> In *T.L.O.*, we recognized that the school setting "requires some modification of
> the level of suspicion of illicit activity needed to justify a search," and held that
> for searches by school officials "a careful balancing of governmental and private
> interests suggests that the public interest is best served by a Fourth Amendment
> standard of reasonableness that stops short of probable cause."  We have thus
> applied a standard of reasonable suspicion to determine the legality of a school
> administrator's search of a student and have held that a school search "will be
> permissible in its scope when the measures adopted are reasonably related to the
> objectives of the search and not excessively intrusive in light of the age and sex of
> the student and the nature of the infraction."[29]

> The Court found that the school officials' suspicion was enough to justify a search of

Redding's backpack and outer clothing.[30]  In so ruling, the Court stated: "If a student is

reasonably suspected of giving out contraband pills, she is reasonably suspected of carrying them

---

[29]*Id.* at 2639 (quoting *T.L.O.*, 469 U.S. at 340, 341, 345, 342).

[30]*Id.* at 2641.

on her person and in the carryall that has become an item of student uniform in most places today."[31]

The Court then went on to consider the constitutionality of the strip search.  The Court noted that "[t]he indignity of the search does not, of course, outlaw it, but it does implicate the rule of reasonableness as stated in *T.L.O.*, that 'the search as actually conducted [be] reasonably related in scope to the circumstances which justified the interference in the first place.'"[32]  The Court went on to state that "[t]he scope will be permissible, that is, when it is 'not excessively intrusive in light of the age and sex of the student and the nature of the infraction.'"[33]

The Court found that "the content of the suspicion failed to match the degree of intrusion."[34]  The school officials knew the nature of the pills at issue and that they posed no real harm.[35]  Further, there was nothing to suggest that Redding was hiding pills in her underwear. Nor was there any "evidence in the record of any general practice among Safford Middle School students of hiding that sort of thing in underwear."[36]

> In sum, what was missing from the suspected facts that pointed to [Redding] was any indication of danger to the students from the power of the drugs or their quantity, and any reason to suppose that [Redding] was carrying pills in her

---

[31]*Id.*

[32]*Id.* at 2642 (quoting *T.L.O.*, 469 U.S. at 341).

[33]*Id.* (quoting *T.L.O.*, 469 U.S. at 342).

[34]*Id.*

[35]*Id.*

[36]*Id.*

underwear. We think that the combination of these deficiencies was fatal to finding the search reasonable.[37]

The Court further stated:

We do mean, though, to make it clear that the *T.L.O.* concern to limit a school search to reasonable scope requires the support of reasonable suspicion of danger or of resort to underwear for hiding evidence of wrongdoing before a search can reasonably make the quantum leap from outer clothes and backpacks to exposure of intimate parts. The meaning of such a search, and the degradation its subject may reasonably feel, place a search that intrusive in a category of its own demanding its own specific suspicions.[38]

Though the Court found that the strip search was unconstitutional, the Court nevertheless found that the school officials were entitled to qualified immunity because the law concerning strip searches in a school setting was not clearly established at the time of the search.[39]

Whether the strip search in this case was constitutional under the framework established by *Safford* presents a close question. However, the Court need not ultimately determine whether V.W.'s constitutional rights were violated. Determining whether an official is entitled to qualified immunity is a two step process. First, the court must determine whether the facts make out a constitutional violation.[40] Second, the court must decide whether the right at issue as "clearly established" at the time of the defendant's alleged misconduct.[41] "Qualified immunity is

---

[37]*Id.* at 2642-43.

[38]*Id.* at 2643.

[39]*Id.* at 2643-44.

[40]*Saucier v. Katz*, 533 U.S. 194, 201 (2001).

[41]*Id.*

applicable unless the official's conduct violated a clearly established constitutional right."[42]   The Supreme Court has made clear that courts have the discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."[43]

In this matter, the Court finds it prudent to address whether the constitutional right allegedly violated here was clearly established at the time of the search.  The search at issue here occurred in December 2008.  *Safford* was not issued until June 2009.  The Court in *Safford* acknowledged that lack of uniformity concerning strip searches in the school setting prior to its decision and, as a result of that uncertainty, found that the law had not been clearly established at the time of the search in that case.[44]   Thus, the school officials in that case were entitled to qualified immunity.  The same is true here.  There was no controlling case law on the issue of strip searches in the school setting from either the Supreme Court or the Tenth Circuit at the time this search occurred. Therefore, the Court finds that Freeze and Raccuia are entitled to qualified immunity.

2.    *Seizure*

Defendants argue that they are entitled to qualified immunity with regard to the seizure of V.W. because that seizure did not violate the Fourth Amendment.  Defendants do not argue that

---

[42]*Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

[43]*Id*. at 236.

[44]*Safford*, 129 S.Ct. 2643-44.

the law concerning seizures in a school setting was not clearly established at the time of the incident because that law has been clearly established in the Tenth Circuit since at least 1989.[45]

The Tenth Circuit has applied the relaxed standard set forth by the Supreme Court in *T.L.O.* to school seizure cases.[46]   That is, "a seizure need only be 'justified at its inception' and 'reasonably related in scope to the circumstances which justified the interference in the first place.'"[47]

The Court must first determine whether there was a seizure under the Fourth Amendment.[48]   For the purposes of this Motion, Defendants assume that a seizure occurred.   The Court will do the same.

Next, the Court considers whether the seizure was reasonable.   In making this determination, the Court considers whether the seizure was justified at its inception and whether the seizure was reasonably related in scope to the circumstances which justified the interference in the first place.[49]   The seizure here was justified at its inception.   School officials were faced with an allegation that V.W. was dealing drugs.   It is certainly reasonable for school officials in such a circumstance to detain the student while they attempt to sort out the details of the alleged wrongdoing.

---

[45]*See Edwards v. Rees*, 883 F.2d 882, 884 (10th Cir. 1989).

[46]*Id.*

[47]*Couture v. Bd. of Educ. of the Albuquerque Pub. Sch.*, 535 F.3d 1243, 1250 (10th Cir. 2008) (quoting *Edwards*, 883 F.2d at 884).

[48]*Id.*

[49]*Id.* at 1252-53; *see T.L.O.*, 469 U.S. at 341.

14

The more difficult question is whether the seizure was reasonably related in scope.  "A seizure is 'permissible in its scope when the measures adopted are reasonably related to the objectives of the [seizure] and not excessive[] . . . in light of the age and sex of the student and the nature of the infraction.'"[50] As stated, this seizure began as an investigation into a possible drug deal.  That investigation, however, bore no fruit.  Thus, by the time V.W. was taken to the office, Ms. Freeze testified that V.W. was being detained in order prevent her from going into the hallway to interact with the students.  Ms. Freeze, however, was not concerned that V.W. would try to get rid of any drugs or other contraband.  Therefore, the purpose of the continued detention was to prevent V.W. from talking to other students, which might cause rumors to spread and disrupt the school day.  In viewing the facts in the light most favorable to V.W., this seizure lasted approximately two hours and, despite several requests, she was not allowed to use the restroom.  Instead, V.W. was told to use a nearby garbage can.[51]  With apparently no other options, V.W. was forced to urinate in a garbage can in front of office personnel and a male student.

Based on these facts, as viewed in the light most favorable to her, Plaintiff has presented sufficient evidence from which a finder of fact could find a constitutional violation.  Specifically, Plaintiff has presented evidence that V.W.'s continued seizure was excessive in light of her age and sex and the nature of the infraction.  The stated reason for the continued detention was to

---

[50]*Couture*, 535 F.3d at 1253 (quoting *T.L.O.*, 469 U.S. at 342).

[51]Though Defendants argue the garbage can was to be used in case V.W. was sick, the Court must view the facts in the light most favorable to V.W.

prevent V.W. from discussing the incident with other students.  Under this stated purpose, V.W. was detained for approximately two hours and was not allowed to use the restroom.  After repeatedly asking to use the bathroom, V.W. was given a garbage can and was told to use it if she had to go that bad.  V.W. eventually did urinate in the garbage can in front of office personnel and a male student.  A finder of fact could conclude that this seizure was unreasonable under the circumstances, considering the reasoning behind the detention, the fact that the search of V.W. and her possessions turned up no contraband, and given V.W.'s young age and gender.  Therefore, summary judgment will be denied on Plaintiff's § 1983 claim as it relates to V.W.'s seizure.

Defendants cite to *Couture v. Board of Education of the Albuquerque Public Schools* in support of their motion for summary judgment.  In *Couture*, the Tenth Circuit addressed the use of a timeout room with a student who had severe emotional and behavioral problems.  The court held that the student's detention in the timeout room was reasonable despite the fact that he was kept in the room for long periods of time and, after not being let out, urinated and threw up or appeared to throw up.  Turning to the timing issue, the court found that the continued detention was in response to the students continued misbehavior.  "Thus, the reasonableness of the 'scope' of the seizure expanded given [the student's] conduct."[52]  Turning to the fact that the student sought, but was denied, release to go to the bathroom, the court noted that, while such facts were disturbing, the student had consistently tried to escape the timeout room and used a number of excuses to do so.

---

[52]*Id*. at 1254.

*Couture* is distinguishable from this case in several respects.  First, the detention of the student in *Couture* was based on the severe behavioral problems of the student and was part of an individualized education plan.  There is nothing here to suggest that V.W. had such behavioral issues or that her detention was part of some larger plan.  Second, while *Couture*, like this case, involved a situation where a student was denied the ability to go to the bathroom, the student in *Couture* often attempted to escape the timeout room and used a number of excuses to do so.  Thus, the teachers were dealing with a "boy who cried wolf" situation.[53]  Here, there is nothing to suggest that V.W. was attempting to escape the office when asking to use the bathroom.  Defendants argue that Plaintiff had used the bathroom earlier, but this fact is in dispute.  Fourth, though the student in *Couture* did urinate on himself, there was no evidence that he was ever instructed to do so.  Here, when viewed in the light most favorable to Plaintiff, there is evidence that Plaintiff was informed that she should use the garbage can if she had to "go that bad."  Finally, the timeout room in *Couture* would have offered the student some privacy when he did urinate.  The office, however, provided V.W. no such privacy and, when she did urinate, it was in front of several office personnel and a male student.  In sum, this case is distinguishable from *Couture* and there is sufficient evidence from which a jury could find that the seizure violated V.W.'s Fourth Amendment rights.

---

[53]*Id*. at 1256.

At oral argument, Defendants presented the Court with *Wofford v. Evans*,[54] a case from the Fourth Circuit Court of Appeals.  In that case, several students reported that their classmate, M.D., had brought a gun to school on the day before Thanksgiving.  School officials detained M.D. and questioned her about the allegation.  The following Monday, school officials continued to investigate the incident.  One of the students interviewed stated that he had seen M.D. throw a black handgun into the woods adjoining the school.  School officials again detained M.D. and both school officials and police officers quizzed M.D. about the allegations.  During the detention, M.D. repeatedly asked for her mother and M.D. alleged that her interviewers ignored her requests to visit the restroom.  In total, M.D. alleged that she had been detained for an hour and a half.

The Fourth Circuit determined that the seizure of M.D. did not violate the Fourth Amendment.  The court applied the *T.L.O.* test discussed above, holding that the initial seizure of M.D. on the day before Thanksgiving  was justified at its inception based on the reports that M.D. had brought a gun to school.  The court also concluded that the seizure that day was reasonably related in scope to the circumstances that justified it in the first place.  Specifically, the court noted that "[t]he assistant principal held M.D. no longer than necessary to address this allegation and confirm that she had no gun on her person or in the schoolroom desk."[55]

---

[54] 390 F.3d 318 (4th Cir. 2004).  Plaintiff was provided an opportunity to respond to *Wofford* in writing after the hearing.

[55] *Id*. at 327.

The court next turned to the seizure of M.D. on the Monday following the holiday.  The court noted that the school officials were continuing their investigation of the incident.  As stated, one student claimed to have seen M.D. discard the weapon near the school.  These allegations presented sufficient justification under the first prong of the *T.L.O.*  The court further found that it was "prudent for school administrators to hold M.D. until the police had completed their investigation" to ensure the safety of pupils and staff.[56]  The court further held:

> Permitting M.D. to follow her normal school-day routine would have posed the unacceptable risk of her retrieving the weapon or revealing its location to a peer. The school officials detained the pupil no longer than necessary to obviate this dire possibility. Holding the student until the police had determined that no weapon was present thus satisfied the second part of the *T.L.O.* test.[57]

Thus, the court upheld the detention of M.D.

*Wofford* is distinguishable from the case before the Court on several grounds.  First, the Court notes that *Wofford* is from the Fourth Circuit and is not binding precedent.  Second, the Court finds significant the fact that *Wofford* involved claims that a student brought a gun to school.  As the court there noted, "[w]eapons are a matter with which schools can take no chances."[58]  Here, there were no weapons and, while illegal drugs are another area where schools can take no chances, V.W.'s seizure continued long after any suspicion of drug possession had dissipated.  Third, the detention in *Wofford* occurred during a continuing investigation.  Here, V.W.'s detention continued after the investigation had concluded and the reason for the

---

[56]*Id*.

[57]*Id*.

[58]*Id*. at 328.

continued detention was merely to prevent V.W. from speaking to other students.  Finally, while

*Wofford* contains facts that school officials ignored pleas to use the bathroom, it did not contain

the facts at issue here: that V.W. was forced to urinate in a trash can in the front of school

officials and a male student.

For all of the reasons set forth above, the Court finds that summary judgment is not

appropriate on Plaintiff's seizure claim.

B.      LIABILITY OF DAVINCI UNDER *MONELL*

Plaintiff seeks to impose liability on DaVinci because of the search under *Monell v. New*

*York City Department of Social Services*.  "A plaintiff suing a municipality under Section 1983

for the acts of one of its employees must prove: (1) that a municipal employee committed a

constitutional violation; and (2) that a municipal policy or custom was the moving force behind

the constitutional deprivation."[59]

The policy at issue here provides: "School personnel can search you, your locker, your

personal property and your vehicle parked on school property based on reasonable suspicion."[60]

This policy mirrors the Supreme Court's decision in *T.L.O.*, which requires reasonable suspicion

before a student may be searched.  Thus, the policy is facially constitutional.

> Where a policy is constitutional on its face, but it is asserted that a municipality
> should have done more to prevent constitutional violations by its employees, a
> plaintiff must establish the existence of a 'policy' by demonstrating that the
> inadequacies were a product of deliberate or conscious choice by policymakers.

---

[59]*Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998).

[60]Docket No. 50, Ex. 3, § 4.1.

The standard of fault in that situation is 'deliberate indifference' to constitutional rights.[61]

"[A] plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences."[62]  "Thus, only where a municipality's failure to adopt adequate safeguards was the product of deliberate indifference to the constitutional rights of its inhabitants will the municipality be liable for an unconstitutional policy under § 1983."[63]  Such a showing may be made where a municipality continued to adhere to an approach that they know or should know has failed to prevent tortious conduct by employees or the existence of a pattern of tortious conduct by inadequately trained employees.[64]

Plaintiff argues that the policy should include a limitation that the scope of the search is not excessively intrusive in light of the age and sex of the student and the nature of the infraction. Plaintiff, however, cannot show deliberate indifference.  Therefore, Plaintiff's claim against DaVinci fails.

C.     STATE LAW CLAIMS

Defendant also argues that Plaintiff's state law claims for negligence and intentional infliction of emotional distress should be dismissed under the Utah Governmental Immunity Act.

---

[61]*Szabla v. City of Brooklyn Park*, 486 F.3d 385, 389 (8th Cir. 2007).

[62]*Bd. of Cnty. Commr's of Bryan Cnty. v. Brown*, 520 U.S. 397, 407 (1996).

[63]*Szabla*, 486 F.3d at 389.

[64]*Brown*, 520 U.S. at 407-408.

21

Plaintiff argues that these claims are brought under § 1983 and should not be dismissed.  The

Amended Complaint, however, clearly sets them out as separate claims.  For the same reasons

previously stated by this Court, those claims are barred by the Utah Governmental Immunity

Act.[65]

## IV.  CONCLUSION

It is therefore

ORDERED that Defendants' Motion for Summary Judgment (Docket No. 43) is

GRANTED IN PART AND DENIED IN PART.

DATED   September 8, 2011.

BY THE COURT:

_____

TED STEWART
United States District Judge

---

[65]Docket No. 33 at 8.